MATTIE A. KING, Respondent, v. HARTFORD LIFE & ANNUITY INSURANCE COMPANY, Appellant.

Kansas City Court of Appeals, October 5, 1908.

1. **LIFE INSURANCE: Mutual: Assessments: Forfeiture: Presumption.** The law abhors forfeitures and no presumption to aid them will be indulged not even in the levying an assessment, but on the contrary the company must prove the assessment was necessary, not excessive and levied in the manner and for the purpose prescribed in the contract.

2. ———: ———: ———: **Excessive.** A certificate holder in an assessment company is not required to tender a sum equivalent to a legal assessment to prevent a forfeiture of his certificate but may stand on his right not to respond to an illegal assessment by reason of its excess.

3. ———: ———: ———: **Official Statement: Evidence.** An annual statement of the company to the Commissioners of Insurance is admissible in evidence on the question as to whether a given assessment was unnecessary so far as it may tend to develop the status and condition of the safety funds in the hands of the trustee, although the same is not a liability of the company.

4. ————: ————: ————: ————: **Explanation.**   Two official statements of the defendant company made to the Commissioners of Insurance are examined and held to show such a condition of the safety funds as to render unnecessary the levying of an assessment which a deceased certificate holder had failed to pay; and an attempted explanation by the secretary of the company after the finding is held to contradict the statements and to be wholly insufficient.

Appeal from Jackson Circuit Court—*Hon. Henry L. McCune,* Judge.

AFFIRMED.

*Lathrop, Morrow, Fox & Moore* for appellant.

(1)   The admission of the reports of December 31, 1900, and December 31, 1901, as evidence, was error: (a)   Because the law does not require that the funds belonging to the different forms of policies, should be separately stated, and the plaintiff failed to show that the funds referred to in said reports, pertained only to the single form of policy or contract of insurance in controversy.   Reynolds v. Insurance Co., 88 Mo. App. 679.   (b)   Because the reports are in respect to matters necessarily and by their very nature shifting from day to day; hence as they relate to conditions six months prior and six months subsequent to the time of the default in the payment of the assessment they afford no presumptive evidence of the condition of the particular safety fund pertaining to these policies in question even assuming that the amount of such safety fund is shown by the reports on said dates.   Janssen & Freyschlag v. Stone, 60 Mo. App. 402.   (c)   The report of December 31, 1901, being subsequent to the date of default, was in no event admissible.   Schwartz v. Frank, 183 Mo. 447.

*Fyke & Snider* for respondent.

(1)   The statements made by appellant to the insurance department of Missouri were made by requirement of law and were properly admitted in evidence.

R. S. 1899, sec. 7880; R. S. 1899, sec. 7839; Insurance Society v. King (Ill.), 75 N. E. 166. (2) Under the terms of the contract after the safety fund reached one million dollars all interest accruing thereon, and all additions thereto by payments of new members, was to be distributed to the policy-holders in reduction of their premiums. Insurance Co. v. Shinks (Ky.), 96 S. W. 889. (3) In this case there is no evidence that any assessment has ever been made by the board of directors of the defendant or any other proper authority. The burden is upon defendant to prove that such assessment had been properly and legally made. Earney v. Modern Woodmen of America, 79 Mo. App. 385; Agnew v. A. & W. W., 17 Mo. App. 254; Puschman v. Life & Annuity Co., 92 Mo. App. 640; Stewart v. Grand Lodge (Tenn.), 46 S. W. 579; Hannum v. Waddill, 135 Mo. 153; 2 Bacon, Benefit Societies (3 Ed.), sec. 377, p. 938; Johnson v. Insurance Co., 68 N. W. 299; Lewis v. Benefit Association, 77 Mo. App. 586; Banhazer v. A. O. U. W., 96 S. W. 953; Insurance Co. v. Babbett, 7 Allen (Mass.) 235; Margessen v. Benefit Association (Mass.), 42 N. E. 1132; Larydon v. Same (Mass.), 44 N. E. 266; Benjamin v. Association, 79 Pac. 517; Logsdon v. Supreme Lodge, 76 Pac. 292.

JOHNSON, J.—Action on two policies of life insurance of one thousand dollars each, issued by defendant to Edward M. King, on February 4, 1882. The beneficiaries named were the children of the assured living at the time of his death and plaintiff was the only child. Mr. King died July 4, 1901, at his home in Appleton City. The two policies were issued at the same time, were identical in form and belonged to what defendant called its "Safety Fund" class. Defendant was incorporated in 1867 under the laws of Connecticut, and was authorized by its charter to write any legal form of life insurance contract. It began business on the

"old line" plan and in 1879 added the Safety Fund department as a new feature of its business, and out of that department, issued policies or certificates of membership on what is known as the assessment plan.

It is admitted Mr. King made the payments required to initiate his insurance and that he paid the first ninety assessments levied, the last one of which fell due in March, 1901, but defendant alleges in the answer that he failed to pay the ninety-first assessment which amounted on both policies to $13.50, and should have been paid not later than June 5th, and that on account of this default, defendant declared the policies forfeited and afterward declined to pay the loss.

The reply is a general denial. The cause was tried before a jury, verdict and judgment were for plaintiff and defendant appealed.

On the issue of forfeiture, plaintiff contends that the evidence shows, first, that the ninety-first assessment (non-payment of which is admitted) was not ordered to be levied by defendant's board of directors, a step made essential by the contract, and, second, that the levy of the assessment was wholly unnecessary or, at least, excessive, and, therefore, would have been invalid had it been ordered by the directors. The forfeiture clause in the certificate on which defendant relies provides: "The holder of this certificate further agrees and accepts same upon the express condition that if either the monthly dues, assessments, or the payment of $10 towards the safety fund as hereinbefore required, are not paid to said company on the day due, then this certificate shall be null and void," etc.

Defendant issued a separate certificate for each $1,000 of insurance in the "Safety Fund" class, which certificate called for the payment by the holder of an "admission fee" (agent's commission), another fee of $10 as a contribution to a "Safety Fund," and bound the holder to pay $3 per annum to the expense fund

"on the 1st day of the month after date of issue and at every anniversary thereafter so long as this certificate shall remain in force or by monthly or other pro rata instalments." And also, "to pay said company upon each certificate that shall become a claim, an assessment, in accordance with the table of assessment rates as printed hereon, within 30 days from day on which notice bears date." As to the disposition to be made of the "Safety Fund" fee, the certificate specified: "That said company will deposit said sum of ten dollars, when received, with the trustee named in a contract made with it (of which a copy is printed hereon), as a Safety Fund in trust for the uses and purposes expressed in said contract; and shall at the expiration of five years from July 1, 1879, if said Safety Fund shall then amount to three hundred thousand dollars, or whenever thereafter said sum shall be attained, make a semiannual division of the net interest received therefrom by it, pro rata among all the holders of certificates in force in said department at such times, who shall have contributed, five years prior to the date of any such division, their stipulated proportion of said fund, by applying the same to the payment of their future dues and assessments; and that, whenever said fund shall amount to one million dollars, all subsequent receipts therefor shall be divided by the said company in like manner as the interest. Said company further agrees that if at any time after said fund shall have amounted to three hundred thousand dollars, or after five years from January 1, 1880, if that amount shall not have been attained before that date, it shall fail by reason of insufficient membership, or shall neglect if justly and legally due, to pay the maximum indemnity provided for by the terms of any certificate issued in said department, and such certificate shall be presented for payment to said trustee by the legal holder thereof, accompanied by satisfactory evidence, as here-

inafter provided, of its failure to pay, after demand upon it within the time herein stipulated for limitation of action, then it shall be the duty of said trustee to at once convert said Safety Fund into money and divide the same (less the reasonable charges and expenses for the management and control of said fund) among all the holders of certificates then in force in said department, or their legal representatives, in the proportion which the amount of each of their certificates shall bear to the amount of the whole number of such certificates in force; and that in such event it shall file with said trustee a correct list, under oath, of the names, residences and amounts of the certificates of all members entitled to participate in such division. . . . And said company further agrees that so long as any certificate of membership in its Safety Fund Department shall remain in force, said fund shall be in no wise chargeable or liable for any use or purpose except as above mentioned."

Important provisions of the contract between defendant and the trustee (The Security Company of Hartford) are as follows: "It is hereby mutually understood and agreed by both parties hereto that all the hereinbefore recited agreements of the first party with the certificate holders shall constitute the uses and purposes of the trust expressed herein. And it is hereby further understood and agreed that at such time as it shall be shown that all certificates of membership issued by the party of the first part in its Safety Fund Department have been legally settled and surrendered to it, or properly cancelled in accordance with their terms, it shall be held and considered that the uses and purposes of said trust have been fully accomplished by said insurance company, and the balance of said fund, if any, shall be paid over to the party of the first part. . . . It being understood and agreed that said fund belongs to the party of the first part (defendant) subject to

the expressed trust herein provided. . . . That as often as the sum composing such fund shall be in amount sufficient to purchase one thousand dollars, par value, of United States Bonds, said trustee shall make investments of such funds therein and register the same in its name as trustee of the Safety Fund of the said insurance company, and, provided no default by the party of the first part as hereinbefore recited shall occur, shall accumulate said fund and the income thereof (less the reasonable compensation and expenses), for five years from July 1, 1879, or until such time thereafter as such fund shall amount to three hundred thousand dollars, par value, of the securities purchased for said fund, when the party of the second part will pay over to the party of the first part, semiannually thereafter, all the further income from said fund (less the accruing and unpaid compensation and expenses), to be by the party of the first part used for the purposes mentioned in the hereinbefore recited agreements. And, unless such default shall occur, will thereafter add to the principal of said fund the deposits thereafter received from the party of the first part, exclusive of the income therefrom, until the whole fund shall amount in such securities, at their par value, to one million dollars. And in the event of the failure or neglect mentioned in the hereinbefore recited agreements, will convert said fund into money and distribute the same in accordance with the hereinbefore recited agreements, as soon as can reasonably be done after the necessary information of the proper persons and their shares shall have been obtained; said party of the first part hereby agreeing to put the party of the second part in possession of the information required for the making of a proper distribution thereof as agreed with its certificate holders."

It will be observed that insurance written in the "Safety Fund" department was purely mutual. The expenses of management and compensation of defendant

for handling the business were to be paid out of the
expense fund maintained by the payment of $3 per year
on each $1,000 of insurance. Death claims were to be
paid out of the proceeds of assessments levied on the
certificate holders, and the "Safety Fund" in the hands
of the trustee, created solely by the contributions of·
members stood primarily as a fund to protect the cer-
tificate holders against disasters, such as might come
from an extraordinary number of death claims, unsuc-
cessful business or business management and, incident-
ally, as a fund the earnings of which, by being prorated
among the certificate holders who had been paying for
five years, would ease somewhat the ever-increasing
burden of their assessments. King contributed $20
toward this fund and in the course of fourteen years
received from it $35.80 in the form of credits on his as-
sessments. Plaintiff claims that defendant and the
trustee had on hand other funds aggregating over $450,-
000, which should have been distributed among the cer-
tificate holders and which were more than sufficient to
pay the death losses of $380,000, for which the ninety-
first assessment was levied. This is denied by defend-
ant whose officers testified that no funds were available
for such distribution. It is conceded defendant pro-
posed to pay the death losses in process of adjustment
entirely from the proceeds of the ninety-first assess-
ment, and it is evident from the figures before us that
such proceeds equaled and, in fact, exceeded the amount
for which provision was to be made.

The law abhors forfeitures and courts will indulge
in no presumption to aid them. Under the admission of
the pleadings that King was a certificate holder in good
standing up to the time he defaulted in the payment of
the ninety-first assessment, the burden was on defend-
ant to show affirmatively the existence of the facts on
which it predicated its right to declare a forfeiture.
No presumption of right acting in the levy of the assess-

ment will be entertained, but on the contrary, defendant will be held to prove that the assessment was necessary, was not excessive and was levied in the manner and for the purposes prescribed in the contract. [Earney v. Modern Woodman, 79 Mo. App. 385; Agnew v. A. O. U. W., 17 Mo. App. 254; Puschman v. Insurance Co., 92 Mo. App. 640; Hannum v. Waddill, 135 Mo. 153; Stewart v. A. O. U. W., 46 S. W. 579; 2 Bacon on Benefit Societies (3 Ed.), sec. 377.]

If the assessment were excessive, that is to say, if, after making reasonable allowance for expenses and failures to make collections, the proceeds of the call would exceed materially the amount required to meet death claims, the failure or refusal of King to pay the assessment could not be used by the company as a pretext for the forfeiture of his insurance. A certificate holder in an assessment company or association of whom an excessive assessment is demanded is not required to tender a sum equivalent to a legal assessment in order to prevent a forfeiture, but may stand on his right to refuse to acknowledge any liability to respond to such illegal assessment. He cannot be put in the wrong until he rejects or neglects a lawful demand. [Insurance Co. v. Babbett, 7 Allen (Mass.) 235; Mangessen v. Benefit Assn., 42 N. E. 1132; Benjamin v. Life Assn., 79 Pac. 517; Logsdon v. Supreme Lodge, 76 Pac. 292.]

To establish her claim that the assessment not only was excessive but was wholly unnecessary, plaintiff introduced in evidence, over the objection of defendant, the sworn annual statements of defendant filed with the Superintendent of Insurance of this State at the close of the years 1900 and 1901. In the first of these, under the head of "Non-Ledger Liabilities," and subhead "other liabilities" appear these items:

| | | |
|---|---|---|
| Net Safety Funds in Security Co. | | $1,112,569.14 |
| Reserve on Safety Fund Policies | $265,104 | |
| Less deferred premiums .... | 34,884 | 230,220.00 |
| Mortuary Fund held in addition to reserve ................ ........ | | 111,495.36 |
| | | $1,454,284.50 |

Under the head of non-ledger assets is the item: "Premiums (assessments) in course of collection, Safety Fund Department, $349,000." And among the non-ledger liabilities, it is shown that the amount of the death losses in the Safety Fund Department in course of adjustment and not due was $393,750. In the "Exhibit of Policies" the certificates issued from the Safety Fund Department are classed under the head "All Other Policies," the other classes being "Whole Life Policies" and "Endowment Policies." The amount of insurance outstanding in the first-mentioned class at the close of the year 1900 is given at $72,519,769. The statement filed at the end of 1901 shows the following items:

| | |
|---|---|
| "Net Safety Fund in Security Company, Hartford ........ | $1,166,905.02 |
| Reserve on Safety Fund Policies ........ ............ | 262,257.00 |
| Mortuary and other funds in addition to reserve ........... | 116,313.59 |
| | $1,545,475.61 |

Death losses in process of adjustment and not due in Safety Fund Department, $328,750. "Premiums in course of collection Safety Fund Department, $358,300; Policies outstanding at end of year 1901, $68,345,961." The decrease in the volume of business in Safety Fund Department during the year 1901 is explained by the

statement of witnesses that in 1899 defendant decided to discontinue this department and its business therein was being slowly wound up.

We think the objection made by defendant to the admission of these statements in evidence is not well founded. It is true, as counsel urge, they are evidence only of such facts as are required by law to be stated in them. [Reynolds v. Insurance Co., 88 Mo. App. 679.] But the items we have quoted from the statements, even those relating to the so-called "Safety Fund" manifestly were inserted in obedience to the mandate of the statute. [R. S. 1899, section 7880.] We concede the certificate holders and not the company were the beneficiaries of that fund and that as long as it was held by the trustee it was not a liability of the defendant to the certificate holders, but its status or condition was a fact of which the trust agreement required the trustee to keep defendant informed and was one which very closely concerned the affairs of defendant and its certificate holders. Certainly under the thirteenth clause of section 7880, supra, the Superintendent of Insurance was authorized to require defendant to make an exposition of the condition of that fund and it must be presumed that the showing was made either in obedience to such requirement or in anticipation that if it were not included demand would be made for it. The statements were properly admitted in evidence.

The figures quoted when considered in the light of the conceded facts in evidence clearly point to the existence of the following state of facts:

At the time of the filing of the first statement in evidence, the "Safety Fund" in the custody of the trustee long since had reached its contractual limit of $1,-000,000, and had accumulated net earnings of over $112,000, which had not been, but should have been, paid over to defendant for distribution among the certificate holders. This excess must have represented the

earnings of the fund for, at least, two years or over, since the contract provided that when the fund should reach $1,000,000, the "Safety Fund" fees paid in by new members should not be turned over to the trustee, and the fund being invested by the trustee in bonds of the United States had its earnings confined to the low rate of interest paid on such securities.

During the year 1901, this excess increased from $112, 569.14 to $166,905.02—a difference of $54,335.88—obviously the full amount of the increment for that year. It is perfectly apparent that for at least three years before the levy of the ninety-first assessment, defendant had received from the trustee no payment from the earnings of the fund, though the contract called for semiannual payments of the excess over $1,000,000. In the meantime, defendant, in violation of the contract with its certificate holders was piling up a "Reserve on Safety Fund Policies" and what was but another name for the same thing, "A Mortuary Fund." These illegal funds which belonged to the policy holders and which defendant had no authority or semblance of right to create necessarily were made up of surplus from proceeds of mortuary assessments over what was required to pay death claims: "Safety Fund" fees paid in by members after the fund in the trustee's hands had reached $1,-000,000, and which were retained by defendant and the earnings of the fund thus accumulated. Thus, when the assessment was levied, there was, all told, $454,-284.50 available for the payment of $380,000 in death claims in process of adjustment and not due. Beyond the bare assertion that defendant had no funds applicable to the purpose for which the assessment was levied, its witnesses offer no answer to the irresistible conclusion that must follow from the facts disclosed by these sworn statements.

In an affidavit filed in support of the motion for a new trial, defendant's secretary attempts to explain the

nature and condition of the "Reserve" of $230,220 by saying that it was "A reserve held by the company on stipulated premium policies, a form of policy under which the premium is not variable but fixed and guaranteed by the company." This was not an explanation but a flat contradiction of the statement made to the insurance department which the secretary signed and verified, that the item belonged to the "Safety Fund." Further, he states that the Safety Fund in the custody of the trustee was made up of $995,146.25 belonging to the men's division, and $117,422.89 belonging to the women's division. Neither the contract of defendant with its certificate holders nor that with the trustee authorized or even mentioned such divisions, but required the surplus over one million dollars to be applied to the reduction of assessments. Defendant could not create divisions and classes not authorized by the contract. Even the poor explanation offered in this affidavit for the action of the company in levying an altogether unnecessary assessment was not made at the trial, and we do not hesitate in saying that on the admitted facts the trial judge would have been justified in instructing the jury that the assessment was illegal. Defendant not only failed completely to adduce any substantial evidence in support of the legality of the assessment, but the sworn statements to the insurance department which stand unanswered by any evidence, show beyond peradventure that the assessment was wholly unnecessary. Our conclusion is that defendant has failed to sustain its burden of proof.

Point is made that the action is barred by the stipulation in the contract which limited the time in which suit could be brought, but we rule this point against the contention of defendant. An inspection of the whole record convinces us that no error was committed against defendant and that the judgment should be affirmed. It is so ordered. All concur.