# ELIZA IBS v. HARTFORD LIFE INSURANCE COMPANY.[1]

## May 2, 1913.

## Nos. 18,088— (166).

**Life insurance — assessment to pay future losses — tender — evidence.**

Action to recover on a benefit certificate, or policy of life insurance upon the assessment plan; the defense being that the insured had failed to pay an assessment and an instalment of dues, and that the policy had therefore been forfeited:

(1) Evidence considered, and *held* to show conclusively that there was no necessity to levy an assessment to pay any part of the death claims, to pay which the assessment in question was levied; the mortuary fund on hand available for the payment of death claims being more than sufficient in amount to pay all such claims.

(2) The policy does not authorize the levy of an assessment to pay losses that may be anticipated to occur in the future, and in the absence of such authorization an assessment that is unnecessary to pay accrued losses, but which is really levied to create a fund out of which to pay future losses, is illegal, and the failure to pay such assessment is not ground for a forfeiture of the policy.

(3) Though keeping a balance in the mortuary fund for convenience in the prompt payment of losses may be warranted by the contract, yet when such balance is sufficient in amount to pay all losses that have accrued, an assessment to pay such losses is illegal to the extent that a forfeiture cannot be predicated upon the nonpayment of such assessment.

(4) The assessment in question, though nominally levied to pay specified death claims that had accrued, was in reality levied to create or replenish a fund out of which to pay future losses.

(5) It having been the long-continued and uniform custom of defendant to give the insured notice of each demand for expense dues, thus giving the insured the right to believe that such notice would be continued to be given, defendant cannot forfeit the policy for a failure to pay dues as to which no notice has been given.

[1] Reported in 141 N. W. 289.

Note.—On the question of the effect of custom to give insured notice of maturity of premium where insured is not otherwise entitled to notice, see note in 20 L.R.A.(N.S.) 1037.

(6) The notice given in this case, demanding payment of a single amount, which included the illegal assessment and the quarterly dues, and notifying the insured that, unless such amount was paid by a day stated, his policy would be forfeited, made it clear that a tender of the dues alone would have been a vain and idle ceremony, and the law does not require a tender under such circumstances. Such notice was not a sufficient notice as to the dues.

(7) It was not error to exclude from evidence certain decrees of a Connecticut court, neither the issues nor the parties being the same as in the case at bar. Nor did the court, in excluding such decrees, violate either the full faith and credit clause of the United States Constitution, or the provisions of such Constitution forbidding any state to pass any law impairing the obligation of contracts.

After the former appeal reported in 119 Minn. 113, 137 N. W. 289, the case was tried before Dickson, J., who directed a verdict in favor of plaintiff for the amount demanded. From an order denying defendant's motion for judgment notwithstanding the verdict or a new trial, it appealed. Affirmed.

*Jones, Hocker, Hawes & Angert, Durment, Moore & Sanborn* and *George F. Haid,* for appellant.

*O. E. Holman,* for respondent.

Bunn, J.

This is an action to recover upon a certificate of membership, or policy of life insurance upon the assessment plan, issued by defendant to Hermann Ibs, in which policy plaintiff was designated as the beneficiary. At the close of the evidence, the trial court directed a verdict in favor of plaintiff for the full amount of the policy, with interest. Defendant appeals from an order denying its motion for judgment notwithstanding the verdict or for a new trial.

The case was before us at the April, 1912, term on an appeal by plaintiff from an order denying a new trial after a dismissal. Without determining the questions argued on that appeal, we held that there ought to be a new trial, to "clarify the claims of the respective parties, and enable the court to determine the case upon the merits as then presented." Ibs v. Hartford Life Ins. Co. 119 Minn. 113, 118, 137 N. W. 289. The case is before us now after such a determination on the merits by the trial court. It is not claimed that

there was any question in the case for the jury to pass upon, and clearly either plaintiff or defendant was entitled to a directed verdict.

As stated in our opinion on the former appeal, the defense to the action was the failure of the insured to pay the dues and a certain assessment, which were due and payable June 20, 1910. Plaintiff admitted this failure to pay these dues and this assessment, but claimed that the assessment was unlawful under the terms of the contract, and the failure to pay the dues did not forfeit the policy, because the "call" for the same was coupled with the demand for the illegal assessment, and also because defendant had in its possession, at the time of the alleged default, money derived from the accumulated interest on its safety fund, which the contract provided should be distributed among the policy holders in reduction of their dues.

This question of the duty of the defendant to apply the insured's proportion of the safety fund in payment of his dues in order to save a forfeiture, is not presented on this appeal. The main questions now before us for decision are: (1) Was the nonpayment of the assessment ground for forfeiture of the policy? (2) If it was not, was the failure of the insured to pay the dues payable June 20, a sufficient ground?

To determine the legality of the assessment in question, we must look to the language of the contract, and to the facts relating to the purpose for which the assessment was levied. By the terms of the certificate or policy, issued by defendant to Ibs April 4, 1885, he agreed to pay and was required to pay assessments proportioned to the maximum indemnity provided for by the policy, which assessments, in the language of the policy, are to be "levied against the herein named member *to form a mortuary fund for the payment of all indemnity matured by deaths of members,* which assessments, to be levied upon all the members in the department wherein this certificate is issued, *whose certificates are in force at the dates of such deaths,* shall be made according to the table of graduated assessment ratios given hereon, and as further determined by their respective ages and the aggregate maximum indemnity *at the dates of such deaths* with due allowance for discontinuance of membership."

It is further provided in the policy that the member "also agrees to pay said company, *upon all certificates that shall mature by death,* within thirty days from day on which notices bear date, all assessments determined as within set forth, the proceeds of which, after deducting ten cents on each assessment for cost of collection, shall form said mortuary fund."

The facts relating to the levy of the assessment, for the nonpayment of which the policy was declared forfeited, are as follows:

The call for the assessment was sent to the insured May 2, 1910. The notice states that the assessment "is made to meet 145 deaths (as shown by accompanying list), benefits $323,919.95." The list accompanying the notice contained the names of 145 deceased members, the claims of whose beneficiaries were included in the call and aggregated the exact amount of the assessment, together with the dates of their deaths, beginning September 28, 1909, and ending February 13, 1910.

The assessment was based upon conditions and data existing as of the date March 31, 1910, and its preparation was begun April 1. On March 31, the mortuary fund, made up from the accumulations of prior assessments, amounted to the sum of $168,473.58. Of the death losses, to pay which the assessment was levied, and stated in the call, aggregating $323,919.95, there had been paid prior to March 31, $198,994.19, leaving $124,925.76 unpaid, a sum less by $43,-547.82 than the balance then in the mortuary fund.

It is plain, therefore, that all of the death losses, to pay which the assessment in question was levied, could have been paid out of this mortuary fund, without levying the assessment, and a balance of over $43,000 left in the fund. We think it clear that the necessity for this assessment and its validity must be determined by the condition of the so-called mortuary fund on March 31, and the amount of the death losses to pay which the assessment was levied, according to the notice sent to members. There were some death losses at that date which, though not used as a basis for arriving at the amount of the assessment, and not mentioned in the call, had been reported to defendant, and part of them approved. We hold that these should not be considered. The assessment was not levied to pay such losses,

but only the losses stated in the list accompanying the notice. Death losses not included in this list were included in subsequent assessments.

1. We have, then, this situation: There was no necessity to levy an assessment to pay any part of the losses included in the list attached to the notice. They could all have been paid out of the balance in the mortuary fund, and a balance left in that fund. Was it legal for defendant to forfeit a contract of a member for the nonpayment of an assessment, made nominally to pay specified death losses that had already occurred, but in reality to create or replenish a fund out of which future death losses could be paid?

2. We have hereinbefore stated the provisions of the contract that relate to the purposes for which assessments may be levied, and have italicized the language which is pertinent on the question before us. It is true that it is provided that assessments shall be levied "to form a *mortuary fund*"; but it is stated that this fund is for the payment of "all indemnity matured by deaths of members," and that the assessment is to be levied upon all members "whose certificates are in force at the dates of such deaths," and made according to a table of graduated assessment ratios, and "further determined by their respective ages and the aggregate maximum indemnity *at the dates of such deaths.*" And the agreement of the member is to pay, "*upon all certificates that shall mature by death* * * * all assessments determined as within set forth." And it is again provided that the proceeds of such assessments, after deducting the cost of collection, shall "form said mortuary fund."

We see nothing in the language quoted, or in any other provisions of the contract, that expressly or by necessary implication authorizes the insurer to accumulate a "mortuary fund" out of which to pay death losses that occur in the future. The whole sense of the contract is that an assessment may be levied to pay losses already sustained. Calling the fund obtained by an assessment a "mortuary fund" does not warrant the accumulation of such a fund for the payment of future death claims. This conclusion is strengthened by the long-continued and universal custom of the company to state in the notice of each assessment the names of the deceased members to

pay the claims of whose beneficiaries the assessment is made, with the dates of their deaths and the amounts of the claims, and by the fact that each assessment is in amount identical with the aggregate amount of the death losses so stated. The necessary effect of a contrary holding would be to authorize the accumulation by assessments of an immense "mortuary fund," when such a fund was wholly unnecessary to pay present claims—this to the great burden of assessed members, and to the advantage of no one. Members would often be obliged to pay for losses that accrued after their own deaths, or after they ceased to be members, contrary to the declarations in the contract that members shall be assessed for the payment of "indemnity matured by deaths of members," and upon "certificates [that are] in force at the dates of such deaths," and that they agree to pay assessments upon "all certificates that shall mature by death."

It is settled law that an assessment to pay future losses is illegal, unless the power is conferred by the contract; and we hold that the contract between the insured and defendant cannot be fairly construed as conferring that power. As it is clear that the assessment in question here was not necessary to pay accrued losses, but was in reality levied to pay losses that might be anticipated to occur in the future, it follows that it was unauthorized and could not be made the basis of a forfeiture. The case of Schultz v. Citizens' Mut. Life Ins. Co. 59 Minn. 308, 61 N. W. 331, is decisive on the proposition that an assessment to pay future losses is void if the contract does not authorize an assessment for such purpose, and our decision that the contract does not authorize such an assessment is sustained by King v. Hartford, 133 Mo. App. 612, 114 S. W. 63, and Johnson v. Hartford, 166 Mo. App. 261, 148 S. W. 631. These cases involve the same form of contracts as the case at bar, and are directly in point. Other authorities on the proposition that an assessment in anticipation of losses is illegal, unless authorized by the contract, are People v. Babbitt, 7 Allen [89 Mass.] 236; Rosenberger v. Washington, 87 Pa. St. 207; Hogan v. Pacific, 99 Cal. 248, 33 Pac. 924. See also Bacon, Life Insurance (3d Ed.) § 377; Niblack, Benefit Societies, § 254.

3. Great stress is laid on the practical necessity of keeping a balance in the mortuary fund. It probably is true that it is convenient and altogether desirable to have money on hand out of which to pay promptly losses that have accrued. And we do not hold that this course is not warranted by the provisions of the contract. What we do hold is that, when this balance on hand is sufficient in amount to pay all losses that have accrued, an assessment to pay such losses is unnecessary and illegal, at least to the extent that a forfeiture cannot be predicated upon the nonpayment of such an assessment.

4. It is disputed that the assessment in question was levied to pay anticipated losses in the future. It is true that it was levied to pay specified past death claims, if the purpose was as stated in the notices sent to members. But it is conclusive that it was not necessary to levy any assessment in order to pay the death claims named in the notice, that such death claims were already paid in part out of the mortuary fund, and that all could be so paid and a substantial balance left in that fund. It seems to follow necessarily that the amount realized from the assessment in question would be used to pay future death claims. It does not help to say that the proceeds would go to replenish the mortuary fund, or to say that it was necessary and lawful to keep a balance in this fund. Equity, in its abhorrence of a forfeiture, will say that, when that fund reaches a sum sufficient to pay all accrued death claims, the beneficiary of a deceased member, who has paid his dues and assessments for 25 years, may well claim that a forfeiture cannot be based upon the failure of such member to pay an unnecessary assessment.

5. Having reached the conclusion that the assesment was unnecessary and illegal as to Ibs, it remains to be considered whether his failure to pay the expense dues avoided his contract and justified defendant in forfeiting it. It is conceded that the accumulated interest from the "safety fund," which the contract provided should be divided between the members in reduction of dues and assessments, had been so applied, and that defendant did not have these funds in its possession at the time of the alleged default. We are unable, therefore, to apply the rule as to the duty of defendant to use funds in its possession belonging to the insured in order to pre-

vent a forfeiture. We doubt, also, whether defendant could legally have applied the balance in the "mortuary fund" to the payment of dues of members, as we do not hold that the members were entitled to a distribution of this fund.

This brings us to a difficult and perhaps doubtful question, said in the opinion on the former appeal to be an important one. This question was there stated [119 Minn. 116, 137 N. W. 290] to be "whether the insured was justified in failing or refusing to pay the dues because the notice was coupled with an illegal demand for the assessment." In the solution of this problem it is not important that there is no evidence that the insured actually based his refusal to pay dues upon this ground. Defendant is seeking a forfeiture, and if there can be found a valid excuse or justification for the neglect, the beneficiary ought to be permitted to take advantage of such excuse or justification, even though the failure of the insured was actually due to mere neglect, or, as quite probable, to illness.

In the former opinion, it was said that the solution of this question "might to some extent depend upon the question whether defendant was under obligation to give the notice, and whether the insured would have been justified in failing to pay until he received the same." What was not clear when the case was here before is clear now; that is, that it was the long-continued and uniform custom of the company to give the insured notice of each demand for dues. While the policy did not expressly require such notice, it did not expresly say that notice was unnecessary. It did provide that a printed or written notice, addressed to the member, should be sufficient for all purposes, and reasons may be suggested for the adoption of the uniform custom to give notice. The exact dates for the payment of dues were not definitely fixed by the contract, though we do not say that a member might not figure out the dates when his "monthly or other pro rata instalments * * * for periods of less than a year" were payable. While the amount of the dues was fixed at $6 per year, or $1.50 per quarter, it appears that the insured might, at any time, be entitled to a reduction of this amount from his share of the interest from the safety fund. There is abundant ground, both on principle and on authority, for holding,

as we do, that, having given the insured the right to believe that notice of the amount and time for payment of his dues would be given him, the company cannot forfeit the policy for a failure to pay dues, as to which no notice has been given. Insurance Co. v. Hyde, 101 Tenn. 396, 48 S. W. 968; Mayer v. Mutual, 38 Iowa, 309, 18 Am. Rep. 34; Union Central v. Pottker, 33 Oh. St. 459, 31 Am. Rep. 555; Helme v. Philadelphia, 61 Pa. St. 107, 100 Am. Dec. 621; Grant v. Alabama, 76 Ga. 583. Contra, Thompson v. Ins. Co., 104 U. S. 252, 26 L. ed. 765.

6. Was the notice given the insured in this case sufficient? It was as follows:

"SPECIAL NOTICE OF QUARTERLY CALL
No. 127.
\*    \*    \*

"Herman Ibs,
    "105 Central Ave.,
        "St. Paul, Minn.
    "This call, which will be due June 1st, 1910, is made to meet 145 deaths (as shown by accompanying list), benefits $323,919.95, and expenses on your policy as follows:

"For mortality call ..........................$33  95
"For quarterly dues to Sept. next .............  1  50
"Credit ...................................

"Amount due ........................$35  45
"Payment will not be accepted later than June 5, 1910. \*   \*   \*

"Unless the payment called for by this notice shall be paid to the company at its home office by or before the day it falls due, the policy and all payments thereon will become forfeited and void."

It is perfectly clear that this is a demand for $35.45, the assessment and dues, as one payment. The notice that unless *"the payment* called for by this notice shall be paid" on or before the day it falls due leaves no room to doubt that a tender of the $1.50 for dues would have been refused. Was the insured obliged to make this tender? True, the demand specified the amount of the dues; but it

seems quite apparent that the assessment was the main thing, and that the tender of the dues would have been a useless act.

It is a rule of the law of tender that when the creditor demands an amount larger than he is entitled to, and refuses to receive anything less, a tender of the correct amount is waived. In other words, when it is clear that a tender would have been refused, the law does not require the doing of the vain and useless act of making such tender. 28 Am. & Eng. Enc. (2d Ed.) 7. A tender is waived where the tenderee takes any position which would render a tender, so long as the position taken by him is maintained, a vain and idle ceremony. 38 Cyc. 135; Gill v. Newell, 13 Minn. 430, 436 (462). The company in the case at bar clearly took the position that, unless payment of the entire sum, assessment and dues, was made, the policy would be forfeited. It is still maintaining that position. It not only demanded more than it was entitled to receive, but expressly told the insured that, unless the entire sum demanded was paid, a forfeiture would result.

We feel fully justified in holding that a tender of the $1.50 would have been a "vain and idle ceremony"—a useless act. This conclusion is amply sustained by the authorities on the subject of tender. In addition to those already cited, we refer to the following: Weinberg v. Naher, 51 Wash. 591, 99 Pac. 736, 22 L.R.A.(N.S.) 956; Bowden v. Dugan, 91 Me. 142, 39 Atl. 467; Hamilton v. McLaughlin, 145 Mass. 20, 23, 12 N. E. 424. The case of King v. Hartford, 133 Mo. App. 619, 114 S. W. 63, sustains the position of plaintiff on this point, though the opinion does not state that there was a fixed amount payable as dues. The cases relied on by defendant are clearly distinguishable. Our conclusion on this branch of the case is that Ibs was not obliged to do the useless act of making tender of the amount of his dues, and that the notice given him, coupled as it was with a demand for the payment of an illegal assessment, was not a sufficient notice as to dues.

It is claimed that it was prejudicial error to exclude from evidence the decrees in the case of Dresser v. Hartford Life Ins. Co. in the superior court of New Haven county, Connecticut. It is also claimed that in excluding these decrees the trial court violated section

1, art. 4, of the Constitution of the United States, providing that "full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state," and also section 10, article 1, of such Constitution, forbidding any state to pass any law "impairing the obligation of contracts." The Dresser case was brought by the plaintiff on behalf of himself and other policy holders of defendant against the company and its officers and the custodian of the "safety fund." The main issue in the case was in regard to the safety fund and its management; but it was also claimed by plaintiffs that the defendants, the company and its officers, were levying assessments unnecessary in amount and number for their own wrongful purposes. It was adjudged that this was not true. It was claimed that it was improper and wrongful for defendant to accumulate the margins arising from the difference between the amount of losses paid and the amount of losses assessed for, and to carry this balance in the mortuary fund, and claimed that this balance of margins should be distributed among the outstanding certificate holders; but it was held that it was proper and reasonable that the company should hold some such fund to enable it to pay losses promptly, that the mortuary fund thus formed belongs to the certificate holders, and that the company is reasonably entitled to hold the same as a necessary and proper fund for the payment of death claims.

We are not able to see how these decrees have any material bearing on the issues in the case at bar; much less how they are controlling. The issues here are vitally different from those in the Dresser litigation. There was no question there of a forfeiture, nor of the legality of an assessment levied to pay specified death losses, when the balance in the mortuary fund was ample to pay all such losses. The right to hold a balance in the mortuary fund was affirmed, but not the right to forfeit a policy for nonpayment of an unnecessary assessment. Neither the issues nor the parties were the same as in the case at bar. The decrees are not even authority against plaintiff's contentions here; much less are they binding on the principle of res adjudicata, or estoppel by judgment. This question is discussed and we think correctly disposed of in Johnson v. Hartford, 166 Mo.

App. 261, 148 S. W. 631.   We hold that it was not error to exclude from evidence the decrees in the Dresser case, and that neither constitutional provision referred to was violated.

Order affirmed.

On May 10, 1913, the following order was filed:

PER CURIAM.

It is ordered that the foregoing order of affirmance be amended by adding thereto, "and cause remanded to the court below, with directions to enter judgment for plaintiff upon the verdict."